# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1972

_____

United States of America,            *
                                    *
          Appellee,        *
                                    *   Appeal from the United States
          v.               *   District Court for the
                                    *   District of Minnesota.
Thomas Bernard Cloud, Jr.,    *
                                    *
          Appellant.      *

_____

Submitted:  November 14, 2008
Filed:  February 18, 2010

_____

Before MELLOY, BOWMAN, and SMITH, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Thomas Bernard Cloud, Jr., appeals from the judgment of conviction entered by the District Court[1] after a jury found Cloud guilty of being a felon in possession of a firearm.  We affirm.

_____

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

For his first issue on appeal, Cloud challenges the order of the District Court[2] denying his motion to suppress the firearm in question, his custodial statement, and DNA evidence, arguing that they were all obtained as the result of a seizure that violated his Fourth Amendment rights. With respect to the denial of a suppression motion, we review the court's factual findings for clear error and its legal conclusions de novo. United States v. Pena-Ponce, 588 F.3d 579, 583 (8th Cir. 2009). Cloud does not argue that any of the District Court's factual findings are clearly erroneous, so we recite the facts below as found by the court after the hearing on Cloud's suppression motion. See United States v. Sawyer, 588 F.3d 548, 553 (8th Cir. 2009).

On the night of March 21, 2006, Itasca County, Minnesota, Deputy Sheriff Robert LeClair began following a Cadillac on Highway 46 after noticing that the car had no license plates. LeClair followed the car for two miles and watched it cross the center and fog lines several times. At that point, he stopped the car for those traffic violations, thinking that the driver could be impaired by drugs or alcohol. Upon approaching the car, LeClair did see a temporary license plate in the back window of the Cadillac. The deputy asked the three occupants—the female driver, the male front-seat passenger, and the female back-seat passenger—for identification. None was able to produce identification, but each gave LeClair a name and date of birth. The male passenger, who turned out to be Cloud, gave the name Kristopher Fisher. He appeared nervous and did not make eye contact with LeClair, even when speaking directly to him.

LeClair called dispatch with the information he had been given. The identification information for the two women was valid, with no outstanding warrants for either. The name Kristopher Fisher, however, "came back not on file in the State of Minnesota." Hr'g Tr. at 21. LeClair then asked Cloud to step out of the car so that

---

[2]Judge Tunheim, adopting the Report and Recommendation of the Honorable Raymond L. Erickson, Chief Magistrate Judge for the District of Minnesota.

he could double-check the information Cloud had given; Cloud complied. Upon further inquiry, LeClair learned from a "very nervous" Cloud that Kristopher was spelled with a K and that his middle name was spelled Leigh. Id. at 23. At about that time, ten minutes into the stop, dispatch advised LeClair that the spelling of the name had been corrected and the records located, and Kristopher Fisher had two outstanding warrants. LeClair agreed to take Cloud about ten miles to Cloud's home in Inger to get the $630 bail money to satisfy the warrants, after which Cloud would be released. The deputy handcuffed Cloud and put him in the back seat of the patrol vehicle. LeClair then approached the passenger side of the Cadillac and opened the front door to tell the women what was happening, and he saw a gun partially under the front passenger seat. He grabbed the gun, ordered the women out of the car, and handcuffed them. Soon after, Deputy Darin Shevich arrived on the scene. After the deputies were satisfied that neither of the women knew about the gun, the women were released, and LeClair transported Cloud to the nearest jail in Grand Rapids. About thirty minutes had passed since the Cadillac was first stopped.

In an interrogation room at the jail, LeClair read Cloud his Miranda[3] rights and tape-recorded a brief interview with the suspect. At the hearing on Cloud's pretrial motions, LeClair testified that Cloud was twenty-six years old at the time of the interview and that he appeared to be unimpaired and of normal intelligence. Id. at 37. During the interview, Cloud denied any knowledge of the firearm found in the Cadillac. The next day, pursuant to a warrant, the authorities got fingerprints, palm prints, and DNA samples from Cloud. They eventually determined that he was not Kristopher Fisher at all, but Thomas Bernard Cloud, Jr. The print and DNA evidence were admitted at trial to connect Cloud to the firearm that was retrieved from the Cadillac.

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

Cloud does not question the legality of the initial traffic stop, but argues that the stop became an unconstitutional seizure when the identification information Cloud gave LeClair came back "not on file." He contends that the deputy's further questioning of him at that point was unlawful, and but for the extended seizure, the gun would not have been discovered, the custodial statement would not have been taken, and the warrant for DNA samples would not have been issued.

After a lawful traffic stop, an officer may complete routine tasks, which may include asking a passenger for identification and running a computer check if the passenger consents to the request for identification. See United States v. Slater, 411 F.3d 1003, 1006 (8th Cir. 2005). "A request to see identification is not a seizure, 'as long as the police do not convey a message that compliance with their request[] is required.'" United States v. Carpenter, 462 F.3d 981, 985 (8th Cir. 2006) (quoting Florida v. Bostick, 501 U.S. 429, 435 (1991) (alteration by the Court in Carpenter)), cert. denied, 549 U.S. 1343 (2007). Cloud points to nothing in the record suggesting that he was compelled to give LeClair his name and date of birth. Likewise, LeClair did not violate Cloud's constitutional rights by asking him to step out of the car. See Maryland v. Wilson, 519 U.S. 408, 415 (1997) ("We . . . hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). As for the length of the stop, a lawful detention may be prolonged for a reasonable time without violating the Fourth Amendment if complications arise while checking identification—such as Cloud's alias being reported as "not on file." See United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008). And the record in this case shows that just as LeClair was double-checking the information that Cloud had given him, only ten minutes into the stop, dispatch called back with the information that Kristopher Fisher had outstanding warrants, giving LeClair (who still believed that Cloud was Fisher) the necessary probable cause to seize Cloud. In these circumstances, ten minutes is not an unreasonably long traffic stop. See id. (noting that whether the length of a stop is reasonable will depend on the facts of each case and that there is no per se time limit). We hold that on these facts, LeClair's lawful

stop of the Cadillac did not turn into an unconstitutional seizure of Cloud. We therefore affirm the District Court's denial of Cloud's motion to suppress the gun, his statement, and the DNA samples.

For his next issue, Cloud argues that LeClair violated his <u>Miranda</u> rights by continuing to question him after he invoked his right to counsel. Cloud contends that the following exchange includes "an unambiguous and affirmative request for counsel," Br. of Appellant at 13:

Q. [by LeClair]   Okay. Do you want me to explain what's goin' on here Kris?

A. [by Cloud]    I wish you would.

Q.    Okay. Are you willin' to talk with me, you got to answer–

A.    Well no, you said you were gonna explain something.

Q.    I'm gonna explain it, but I need to know that you're gonna listen and you're gonna be cooperative with me.

A.    Well there ain't nothin' to talk about cuz I don't know nothin'.

Q.    What do you mean you don't know nothin'?

A.    Whatever you're tryin' to– whatever you're tryin'– whatever issues you're tryin' bring me here for. I don't know shit about it, cuz I don't even still understand why I'm here. You said you're gonna take me to get my money and that was it.

Q.    Okay. Do you wish to speak with an attorney?

A.    Yeah. Probably. Cuz you ain't explaining nothin'.

> Q. Do you want– do you want to talk to an attorney, or do you want me to explain things or– or don't you want to talk. You know, I got to know before I get into detail here if you're willing ah– talk to me or not. That's what I need to know.
>
> A. No, I just want to get my money and leave.
>
> Q. Well that's not gonna happen right now. And we need to talk about why that's not gonna happen.
>
> A. Well why? Tell me.

Tr. of Statement of Kristopher Leigh Fisher at 3–4 (Mar. 21, 2006). This colloquy was preceded by LeClair advising Cloud of his <u>Miranda</u> rights and asking Cloud numerous times if he was willing to talk, to which Cloud responded numerous times that he just wanted LeClair to take him to get his money so he could leave. It was followed by LeClair asking Cloud about the gun found in the Cadillac and Cloud denying any knowledge of the gun. Cloud's statement was not inculpatory as to the felon-in-possession charge.

"[W]e have consistently held that only a clear and unequivocal request for the assistance of counsel may serve to invoke a defendant's right." <u>United States v. Kelly</u>, 329 F.3d 624, 630 (8th Cir. 2003). When Cloud was asked directly if he wanted to speak with an attorney, his responses were ambiguous: "Yeah. Probably," and "No, I just want to get my money and leave." Those are not "clear and unequivocal" requests for an attorney such that LeClair was required to stop the interview. Indeed, Cloud continued the conversation himself by asking LeClair to tell him why he would not be released. LeClair committed no constitutional violation during the interview, and the District Court therefore did not err in denying Cloud's motion to suppress his statement on this basis.

For his final issue on appeal, Cloud contends that his Sixth Amendment right to confront the witnesses against him was violated by the testimony of Itasca County investigator Mike Bliss and that the District Court therefore erred in denying his motion for a mistrial on that ground. We review the denial of a motion for mistrial for an abuse of discretion. United States v. Thompson, 533 F.3d 964, 971 (8th Cir. 2008).

Cloud's theory of defense was that the gun in question actually belonged to David Cloud, his cousin. To that end, on cross-examination, Cloud's defense counsel questioned Bliss about his interview with David Cloud, and whether Bliss told David that Bliss had spoken to a witness who had seen David with the gun. The government objected, asking for a limiting instruction. The court overruled the objection and the questioning continued:

> Q. [by defense counsel]     You told [David Cloud] that you had a witness who put him right in with this gun?
>
> A. [by Bliss]    Yes, sir.
>
> Q.     And that with [sic] the same statement in which he told you that he had seen Tom Cloud with the gun?
>
> A.     Yes.

Trial Tr. at 508. Inquiring on redirect examination about the same conversation that Bliss had with the witness, the government asked Bliss, "In addition to Dave Cloud, who else did [the witness] put with that gun?" Bliss answered, "Tom Cloud." Id. at 514. The court overruled defense counsel's hearsay objection. At a sidebar, however, counsel pursued his objection and asked for a mistrial. The court denied the motion for a mistrial but instructed the jury "to disregard the last question and answer given by" Bliss. Id. at 521.

Assuming that the testimony in question was hearsay that should have been excluded, and further assuming that defense counsel did not waive any objection by eliciting the very same testimony before the government did, we hold that the District Court did not abuse its discretion in denying Cloud's motion for a mistrial. Considering the substantial testimonial and demonstrative evidence of Cloud's guilt and the "context of the error," any prejudice to Cloud was minimal. Thompson, 533 F.3d at 971 (citations to quoted cases omitted). Defense counsel himself first asked Bliss if the witness who put David Cloud "right in with" the firearm also told Bliss in the same statement that he had seen Thomas Cloud with the gun. Further, the government, just before asking the question that Cloud challenges on appeal, actually discredited the witness who said that he had seen Thomas Cloud with the gun:

> Q. [by the government]   You were asked about an interview. You were asked about questions that you made to David Cloud, questions that you posed, an interview that you had with the witness. Can you describe for the jury that witness that you interviewed, his credibility?
>
> [Defense counsel's objection that the government was "vouching" was overruled.]
>
> A.     He's not credible.  He has changed his story several times.

Trial Tr. at 513.  Finally, the District Court gave a limiting instruction, which will ordinarily remedy any erroneous admission of testimony.  See United States v. Brandon, 521 F.3d 1019, 1026 (8th Cir.), cert. denied, 129 S. Ct. 314 (2008).  We see no abuse of discretion in the District Court's denial of Cloud's motion for a mistrial.

The judgment of the District Court is affirmed in all respects.

_____

-8-